Filed 6/4/14  P. v. Martin CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JUAN CARLOS MARTIN,<br><br>　　　　Defendant and Appellant. | B244914<br><br>(Los Angeles County<br>Super. Ct. No. NA089631) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Tomson T. Ong, Judge.  Affirmed as modified.

　　　　Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Juan Carlos Martin (defendant) appeals his murder conviction, asserting that the trial court gave an incomplete and misleading instruction on voluntary intoxication and erroneously admitted recorded police interviews without redaction. Defendant also contends, and respondent agrees, that the minutes reflect an unauthorized $100 penalty assessment that should be stricken. We order the trial court to strike the unauthorized penalty, but finding no merit to defendant's other arguments, we affirm the judgment.

## BACKGROUND

### Procedural history

The second amended information charged defendant with the murder of Michael John Schmid (Schmid) in violation of Penal Code section 187, subdivision (a).[1] The information further alleged that in the commission of the crime, defendant personally used a deadly weapon (knife) within the meaning of section 12022, subdivision (b)(1). It was also alleged pursuant to the "Three Strikes" law (§§ 1170.12, subd. (a)-(d), 667, subd. (b)-(i)), and for purposes of section 667, subdivision (a)(1), that defendant suffered a robbery conviction in violation of section 211 in 1993. In addition five prior convictions with prison terms were alleged, pursuant to section 667.5, subdivision (b).

A jury convicted defendant of the murder, found it to be in the first degree, and found true the allegation that defendant had used a deadly weapon in the commission of the crime. Defendant admitted the prior robbery conviction and three prior prison terms. On October 25, 2012, the trial court sentenced defendant to a total of 59 years to life in prison, comprised of 25 years for the murder, doubled as a second strike, plus a consecutive one-year term for the use of a knife, five years for the prior serious felony conviction, and three consecutive one-year enhancements for the prior prison terms. The trial court awarded defendant 473 days of presentence custody credit, ordered him to provide a DNA sample and print impressions, imposed mandatory fines and fees, and ordered him to pay victim restitution.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Defendant and his girlfriend Jennifer Pina (Pina) were homeless in July 2011. Pina's close family friend Gary Ungaro (Ungaro) who managed a residential hotel or apartment building on 11th Street in San Pedro (the building), allowed them to stay there occasionally. Schmid was also homeless and occasionally paid Ungaro for the use of the shower at the building. At approximately 11:00 p.m. on July 15, 2011, defendant and Schmid were in the stairwell of the building when defendant stabbed Schmid once in the chest, piercing his heart and lacerating an artery. Schmid died about two hours later as a result of blood loss. The medical examiner testified that the depth of the stab wound was two to three inches and that a toxicology test showed that Schmid had used methamphetamine and heroin within 24 hours of his death.

A resident of the building, Ralph John Patalano (Patalano), testified that the kitchen, bathroom, and shower were shared by all the residents. The kitchen was on the upper story and connected directly to the lower story by a stairway. As Patalano went into the kitchen that night to cook he saw Schmid and defendant on the stairs. Defendant, whom he knew as "Termite" told Patalano that they would be upstairs in a few minutes. Patalano did not hear any arguing nor did he notice anything unusual about the two men. Mike Sullivan (Sullivan) and Pina were in the kitchen at that time. As Patalano sat down to eat, Sullivan's girlfriend Elvia screamed or yelled that Schmid had been stabbed. When Patalano took out his cell phone to call 911 Sullivan and Elvia told him not to use his cell phone, so he ran outside intending to go to the 7-Eleven store two blocks away. Outside, Patalano saw a burgundy SUV in the driveway. Soon thereafter defendant, Sullivan, Elvia, and Pina came outside. Defendant calmly asked Patalano to tell Ungaro to erase the building's security tapes before leaving in the SUV with Sullivan, Elvia, and Pina. Before running to the 7-Eleven store, Patalano told Ungaro that Schmid had been stabbed and to erase the surveillance tapes.

3

The burgundy SUV was driven by Angel Carrillo (Carrillo).[2] He had pulled into the driveway of the building around 11:00 p.m. that night intending to visit his friend Ungaro. As soon as he arrived defendant and Pina, accompanied by Sullivan and Elvia, asked for a ride. After Carrillo agreed, defendant placed his bags in the luggage space and got into the back seat with Sullivan and Elvia. Carrillo told detectives that during the drive he heard defendant whispering in the back, saying something to the effect that he had "stuck him" and he was not going to make it, or "That fool's done." Carrillo claimed to have then stopped and ordered his passengers out of the car.

In his trial testimony Carrillo denied that he was afraid to testify or that he was afraid of defendant and claimed that there was no "bad blood" between them. He explained that he was reluctant to testify because he did not want to be known as a snitch, as snitching was not well regarded in his community. Carrillo denied hearing defendant's admission in the backseat and claimed he could not remember much of his preliminary hearing testimony. In the recorded interview Carrillo referred to defendant as "Termite," and told detectives that defendant was affiliated with the Lomita gang. Carrillo said that the last thing he wanted was ever to see or talk to defendant again; that Termite was well mannered, but after time, he would become possessive and less tranquil and ends up "fucking robbing you." Carrillo explained that he had not seen defendant rob anyone, but had heard from friends that they had been robbed by defendant. Carrillo added, "They obviously don't report it because . . . [he is] pretty bad news." Carrillo was concerned about giving information to the detectives because he was "still going through shit" as a result of cooperating in an earlier case. Wilmington "RSP" had "paperwork" on him from the incident and he had been fighting for his life for years.

Ungaro was also a reluctant witness and much of his version of the events came from his preliminary hearing testimony and a recording of his police interview. Ungaro testified that he found Schmid hurt and bleeding in the stairwell that night and held a towel on him until the ambulance arrived a few minutes later. After a number of failures

---

[2] Carrillo was a reluctant witness. His version of the events came from both his testimony and his recorded police interview.

4

of recollection, the recorded interview was played for the jury. In the interview Ungaro told detectives that he asked Schmid what had happened and Schmid simply said, "Termite." Ungaro told detectives that Termite's name was Juan, that he was from Lomita, and was a parolee who had been in prison most of his life. Ungaro described Termite as having a shaved head and tattoos. Ungaro admitted to investigating detectives that he had erased the security video,[3] explaining that he was afraid for Pina, whom he called his niece.

Los Angeles Police Department Detective David Cortez testified that "paperwork" was a gang term for reports, recordings of interviews, or other documents proving that a person has testified or cooperated with the police; once paperwork is seen by gang members, they might issue a "green light" to seriously hurt or kill the witness.

Parole Agent Russell Laster testified that he was formerly defendant's parole agent, and that defendant had been discharged from parole in February 2010. Agent Laster went to the building to visit other parolees early on the morning of the stabbing where he saw defendant. Defendant introduced the agent to his girlfriend, Pina, and said that he had known her for about two or three months. Agent Laster testified that Termite was defendant's moniker, which is a gang nickname, and that defendant was a member of the Lomita 13 gang.[4]

Detective David Alvarez testified that he booked all the evidence in this case, including defendant's backpack, in which he found a steno book and a letter. Detective Alvarez read from the letter: "Got to make money and get out of state"; "I just don't know how to rein in my anger"; "And now I may go to prison for life because I just couldn't control myself"; and "I fucked up my life. Just stay with me until I have to go."

---

[3] An FBI forensic computer examiner testified that he was unable to retrieve most of the erased day's worth of video.

[4] Defense counsel objected and the trial court admonished the jury as follows: "Ladies and gentlemen, there's no gang allegation in this case. To the extent there's any mention of any gang, that's solely for the purpose -- you are not to consider it for any purpose in this case whatsoever."

**Defense evidence**

Defendant testified that he had been in a dating relationship with Pina, who he loved, for three or four months prior to July 15, 2011. They were both transient and were together "24/7," living in motels or staying with friends. Beginning in April 2011, Ungaro allowed them to sleep in his unit or the basement of the building, and to shower, eat, and use all the facilities. They kept their personal property in the basement.

During that period defendant and Pina used methamphetamine together daily. Defendant was acquainted with Schmid; they "hung out," drank beer, and injected or smoked methamphetamine together. They also took heroin together a couple times. Defendant and Schmid had never had any kind of problem with each other before. Defendant had never known Schmid and Pina to have problems with each other.

About 30 or 40 minutes before the stabbing, defendant, Schmid, and Pina used methamphetamine in the basement of the building. Later they drank some vodka and beer together on the landing of the kitchen stairway. Schmid had a tendency to make crude sexual remarks, especially when he was intoxicated, and that evening was no exception. He spoke of "bagging whores, getting his dick sucked, things like that." Defendant noticed that Pina had tensed up at the remarks and was becoming upset, so he asked her to go upstairs to make some food. Pina went up to the kitchen, leaving defendant and Schmid alone on the landing.

As Pina left, Schmid stared after her and said, "I'm going to fuck that whore tonight." Defendant was shocked. Schmid knew about defendant's relationship with Pina, and had never before said anything like that about her. When defendant asked, "What did you say?" Schmid replied: "I'm going to get me some more of that whore"; "she sucks good dick"; and that she would "hit" anyone, meaning that she would provide oral sex in exchange for methamphetamine. Schmid's remarks made defendant feel "pretty hot" and when he perceived that Schmid was laughing at him, defendant suddenly found himself on top of Schmid. He realized that he had stabbed Schmid once without thinking. Defendant knew it was wrong but Schmid's remarks about Pina surprised and angered him and he acted in a rage.

6

In retrospect defendant thought it was probably true that Pina was a prostitute, but he did not think so then. However, defendant admitted he did not think that Pina had really had sex with Schmid. He believed that she loved him.[5] Defendant also admitted when Schmid laughed he became even more angry and outraged. Defendant perceived Schmid's laughter as disrespectful toward defendant.

Defendant described the knife as a three-inch folding knife which he kept in its open position, blade down, in his pocket. He stabbed Schmid with his right hand, pulled it out when he realized what he had done, and then put his hand on Schmid's chest to keep him down. He claimed that both he and Schmid said "I'm sorry" to each other. Defendant claimed that he held Schmid down to avoid further problems, even though Schmid had no weapon and was apologizing.

While defendant was on the landing holding down Schmid, Sullivan, Elvia, and Pina ran past him down the stairs. Defendant saw Carrillo's truck in the driveway, and realizing that he was going to be in trouble, followed the others and asked Carrillo for a ride. Because Ungaro had asked them to leave, defendant's bags and backpack were already next to the driveway. He placed the bags in the car, asked Patalano to tell Ungaro to erase the surveillance video, and got into the back seat with Sullivan and Elvia. When asked what had happened, defendant said, "I stabbed him." A short time later Carrillo dropped them at their destination where they all got out with their luggage. Everyone in Carrillo's car had a cell phone but none of them called 911. Defendant claimed he was too scared to call. He put the knife back into his pocket and later discarded it, but he could not recall where.

Defendant admitted he became part of the Lomita criminal street gang in 1992 and that his moniker was Termite. He claimed that Schmid was a member of the San Pedro

---

[5] Defendant did not call Pina once during the year he was in jail awaiting trial. Defendant's former girlfriend Virginia Matera (Matera) was in court throughout the trial, and during defendant's year in jail he spoke to her by telephone about 250 times. Defendant had known Matera for 22 years, dated her for 10 years before they broke up in February 2011, just before defendant met Pina.

7

Stoners gang. Defendant admitted having been previously convicted of resisting arrest and had served a prison term as a result. Agent Laster, whom he saw the day of the stabbing at the building, had been his parole agent. Defendant also admitted having lied to detectives during an interview after his arrest, claiming that he had not been at the building and knew nothing about the stabbing. Defendant also falsely told Detective Alvarez that he had not used heroin or methamphetamine since getting out of prison and that he had been drug free for three to five months, when in fact he had been using methamphetamine on and off since being paroled and had started on heroin again in March 2011. By July 2011, defendant was using from $20 to $60 worth of methamphetamine daily, though he rarely paid for it. He was unemployed at that time and mostly "hustled" to obtain drugs through trade deals.

Defendant testified that he regretted stabbing Schmid and did not intend to stab or kill him when he went downstairs. Defendant admitted that the steno pad found in the backpack was his and that he had written the letter to Pina. Statements about his inability to control himself and the possibility of going to prison for life referred to the stabbing. Defendant acknowledged that he did not write anything in the steno pad about feeling bad about stabbing Schmid.

**Prosecution rebuttal**

Detective Alvarez testified that he and his partner recorded their interview of defendant on July 28, 2011. The recording was played for the jury. Defendant told the detectives that he was 37 years old and had served time in six different prisons. He admitted he was acquainted with Schmid and the building, having stayed at the building occasionally with "Marcus" in room 6. Defendant said he had read about the stabbing in the newspaper and that one of his "homeboys" told him that his name was being "thrown around" in connection with the incident. He refused to reveal the identity of his homeboy.

Throughout the interview defendant repeatedly denied he was at the building the night of July 15, and denied getting a ride from Carrillo. Defendant's remarks displayed more impatience and hostility as the interview wore on, for example: "I don't care what

8

[Pina] said." "I'm telling you the truth, I was not there"; "You're lying . . . fuck you guys . . . I was not there"; "I was not there. Bottom line. . . . [Y]ou guys are trying to get me to tell on myself for something I didn't do? Come on, now. I know you guys do it a lot but it ain't happening here"; "That's fucking sick, you guys are trying to fucking make somebody fucking say they did something"; and, "If you guys feel like you guys got shit on me, well then fucking book me. Simple as that. I was not there. All right?"

**Defense surrebuttal**

Defendant testified that he had ingested methamphetamine prior to the interview, which made him feel pretty aggressive. He admitted that his statements to the detectives were not truthful and that the address he gave them as his last address was Matera's.

## DISCUSSION

### I. Voluntary intoxication

Defendant contends that the instruction given the jury, CALJIC No. 4.21, was incomplete and misleading in that the jury was told it could consider the effect on defendant of any voluntary intoxication in determining whether defendant formed the intent to kill.[6] Defendant contends that the court was required to tell the jury that it could also consider the effect of intoxication in determining whether defendant acted with deliberation and premeditation.

---

**6** The trial court read CALJIC No. 4.21, as follows: "In the crime which the defendant[] [is] accused in count 1 or any lesser crimes thereto, a necessary element is the existence in the mind of the defendant with the specific intent to kill. If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required specific intent. If from all of the evidence you have a reasonable doubt that the defendant formed a specific intent, you must find that he did not have such specific intent." The trial court then read CALJIC No. 4.22, which defines voluntary intoxication, as follows: "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he or she willingly assumes the risk of that effect. Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance."

9

Section 29.4, subdivision (b), allows evidence of voluntary intoxication in a case of murder not only on the issue of whether the defendant formed a specific intent, but also on the issue of whether the defendant premeditated or deliberated the killing. "Although a trial court has no sua sponte duty to give a 'pinpoint' instruction on the relevance of evidence of voluntary intoxication, 'when it does choose to instruct, it must do so correctly.' [Citation.]" (*People v. Pearson* (2012) 53 Cal.4th 306, 325, quoting *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 (*Castillo*).) Misleading instructions "implicate the court's duty to give legally correct instructions." (*Castillo*, *supra*, at p. 1015.)

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) As the party claiming that the instruction was misleading, defendant bears the burden to demonstrate a reasonable likelihood that the jury understood the instruction in the way that he claims. (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) Defendant must do so by reference to "'"the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]" (*Ibid*.) Defendant's analysis falls short of this requirement. He merely points out that CALJIC No. 8.20 contained the concepts of premeditation and deliberation, and that CALJIC No. 8.30 explained that murder is of the second degree if the intent was not a result of premeditation and deliberation. (See § 189; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) Defendant then argues that these instructions made it clear to the jury that the specific intent to kill was a different concept from premeditation and deliberation and that this distinction "would lead the jurors to believe that voluntary intoxication specifically did not apply to premeditation and deliberation."

Premeditation and deliberation are not distinct from intent to kill; rather, they "refer to the quality of the intent to kill" and thus modify and further define the mental state required for first degree murder. (*Castillo, supra*, 16 Cal.4th at p. 1017.) By suggesting that the two concepts are distinct and that the trial court so instructed,

10

defendant has failed to consider all the language of the instruction. As read by the trial court, CALJIC No. 8.20 clearly explained these concepts:

> "All murder[] which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. The word 'willful' means intentional. The word 'deliberate,' which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of consideration for and against the proposed course of action. The word 'premeditated' relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action. If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time. But the mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditat[ed] killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

Thus, the jury was fully instructed on all three mental states. We agree with respondent that any reasonable juror would have understood that he or she could consider evidence of voluntary intoxication in determining not only whether defendant intended to kill, but also whether that intent was premeditated or deliberated. We also agree that if the trial court erred, any such error would be harmless.

Defendant contends that an incomplete instruction on voluntary intoxication implicates his constitutional rights to due process and a fair trial, and thus the applicable test of prejudice is whether the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) However, "[a]ny error would have the

11

effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135; see also *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187.) No constitutional rights are implicated under such circumstances. (See *People v. Pearson, supra*, 53 Cal.4th at p. 325, fn. 9.)

Moreover, an incomplete or misleading instruction on voluntary intoxication cannot have had the effect of excluding any evidence essential to negating premeditation or deliberation, because defendant failed to present substantial evidence of intoxication. It was defendant's burden to raise the issue of voluntary intoxication and to present evidence in support of its application to the facts. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117, 1120.) Indeed it was his burden to not only present substantial evidence of his voluntary intoxication, but to also show how the intoxication affected his "'actual formation of specific intent.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677; see also *People v. Verdugo* (2010) 50 Cal.4th 263, 295.) Instead, defendant testified only that he used methamphetamine daily and that he had used it 30 or 40 minutes before the stabbing. He also testified that he drank some vodka and beer with Schmid while on the landing, a short time before the stabbing. Defendant did not describe the quantity of methamphetamine or alcohol he consumed or whether he felt intoxicated. He did not mention intoxication in his letter to Pina but instead blamed his actions on his temper, explaining: "I just don't know how to rein in my anger"; "And now I may go to prison for life because I just couldn't control myself."

Defendant did not request an instruction on voluntary intoxication; the trial court gave it on its own motion without objection. Had he done so, any objection by the prosecutor would have been well taken, as "merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction . . . . [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1241; see also *In re Avena* (1996) 12 Cal.4th 694, 724.) Not only did defendant fail to request an instruction, he did not even raise the issue of voluntary

12

intoxication at all. In closing argument defense counsel did not claim that intoxication negated any mental state, rather he argued that defendant acted out of rage prompted by insult to the woman he loved. We cannot find a reasonable probability that an incomplete instruction, unsupported by substantial evidence to which defendant was not entitled, could have adversely affected the verdict.

Further, as respondent observes, the jury found that defendant harbored the intent to kill Schmid and thus necessarily rejected intoxication as affecting that mental state; it is thus most unlikely that even with a complete instruction, the jury would have found that the drugs and alcohol ingested by defendant interfered with his ability to premeditate or deliberate.

## II. Admission of entire recordings

Defendant contends that the trial court erred in admitting the recorded interviews of Carrillo and Ungaro and that error resulted in a denial of due process. Defendant argues that the entirety of the two recordings should have been excluded as hearsay.[7] He also argues that the trial court abused its discretion under Evidence Code sections 1101 and 352 in failing to bar irrelevant and inflammatory statements regarding defendant's membership in the Lomita gang and his prior criminality.

The abuse of discretion standard of review applies to any trial court ruling on the admissibility of evidence, including rulings on questions of hearsay, relevance, probative value, and undue prejudice. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Before we undertake such a review, however, it must appear that defendant preserved the issue for

---

[7] Defendant suggests that the interviews should have been excluded on the ground that the prosecutor did not put forward any exception to the hearsay rule, because some but not all the statements in them fell within the exception for prior inconsistent statements. Defendant also contends that the trial court erred in relying on the rule of completeness to admit the Ungaro recording in its entirety, and suggests that he is entitled to reversal due to this error, even though portions of the interview were admissible. (See Evid. Code, § 356.) We review the trial court's ruling, not its reasoning. (*People v. Mickey* (1991) 54 Cal.3d 612, 655.) Thus, if the court properly admitted the evidence we would not reverse simply because the prosecutor put forth the wrong hearsay exception or the court erroneously relied on Evidence Code section 356. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

13

appeal by complying with Evidence Code section 353, which precludes review on appeal unless the record reveals a timely objection or a motion to exclude or to strike the evidence, made on a clearly expressed specific ground. Further, the ground urged on appeal must be the same ground urged in the trial court. (*People v. Valdez* (2004) 32 Cal.4th 73, 108.) Our review of the record shows that defendant made neither specific nor timely objections on the grounds urged on appeal. Defendant claims that the two recordings were played "over defense counsel's objection to the admission of the recordings without redaction." However, defendant does not identify individual passages that should have been redacted or his specific objections to them.[8]

Just before the prosecutor played the recording of Carrillo's interview, defense counsel requested a sidebar conference where he said to the court: "I know there is a CD. . . . It's fairly long and I'm not sure if counsel intends to play the entire tape"; and, "The problem with playing the entire tape, there are some things that appear to be unrelated to this case and there are other things that relate to the detectives, get into defendant's gang affiliation, things of that nature." Defendant did not specify the unrelated passages, state a ground for excluding them or any gang references, or request an admonishment.

Just before the Ungaro interview was played, defense counsel again asked for a sidebar conference and a discussion was held in chambers during which defense counsel said: "Um, well, the only problem is that some of the statements in here appear relevant. There's not an objection to that. Although there appears to be also statements that reflect hearsay statements made by other individuals who apparently are not witnesses who will come before the court. So my concern is that the jury is going to be exposed to potential

---

[8]    Defendant makes multiple references to a discussion relating to his motion for mistrial made just after the recording of the Carrillo interview was played. These references are apparently meant to suggest that he made timely and specific objections prior to the playing of the recording. However, although counsel objected to the entire interview, he did not argue that his objection was directed to the prior ruling admitting the recording and did not move to strike any specific passages. Defendant also made an oral motion for new trial after the verdict, asserting error in admitting Carrillo's entire interview without redaction and in admitting gang evidence. Defendant does not challenge on appeal the denial of either motion.

hearsay evidence that would not otherwise be admissible." Apparently considering the objection untimely,[9] the trial court requested a redacted version and offered: "Since you're the one objecting and you're prepared for this." Defense counsel had not prepared a redacted version; nor did he specify what passages he considered "potential hearsay" or identify the declarants who were not before the court. The court acknowledged that there might be "some . . . information in there that may be hearsay" and invited defendant to submit a curative instruction. The trial court also ruled: "Under the rule of completeness, I'll allow it to be played over your objection."[10] Defendant did not propose a curative instruction or interrupt any part of the recording with an objection to any specific passage.

In sum, defendant did not mention hearsay in the trial court in relation to the Carrillo interview at all; and with regard to the Ungaro interview, defense counsel merely expressed concern about unidentified *potential* hearsay statements from unidentified declarants. Further, defense counsel did not object to playing the Ungaro interview in its entirety and conceded the relevance and admissibility of other unidentified portions. Defendant is bound by counsel's concession that evidence is admissible in part. (See *People v. Pijal* (1973) 33 Cal.App.3d 682, 697.) Finally, defendant did not invoke Evidence Code sections 352 or 1101 as to either interview; nor did he ask the trial court to weigh the probative value of the gang evidence against any potential for prejudice or object to it as inadmissible character evidence. Now however, defendant objects to both interviews on the grounds that the statements of Carrillo and Ungaro were hearsay and unduly prejudicial. We reject any suggestion in defendant's extensive references to the

---

[9] At the motion for mistrial, after the Carrillo recording was played, the prosecutor pointed out to the court that on the previous day when the court heard motions to exclude evidence, defense counsel did not mention the recorded interviews even though he had been given CD's and transcripts more than seven months earlier.

[10] The rule of completeness applies only where the proponent of the evidence has offered selected portions of a conversation, causing it to be misleading, not where it is the objecting party who requests redaction due to portions claimed to be inadmissible. (§ 356; see generally, *People v. Riccardi* (2012) 54 Cal.4th 758, 803.)

15

argument on the new trial motion that there was a timely or specific request that the trial court weigh the probative value against any potential for prejudice in defendant's membership in the Lomita gang and his prior criminality.

Since defendant's contentions on appeal were not raised below, we decline to analyze each recording. "[W]hen a defendant on appeal argues a theory of admissibility of evidence not raised at trial, '[w]e cannot hold the trial court abused its discretion in rejecting a claim that was never made.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 726, quoting *People v. Valdez, supra*, 32 Cal.4th at p. 109.)

In any event, the admission of the two recordings in their entirety was harmless. We apply the *Watson* standard to a claim of erroneous admission of evidence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 671.) Under that standard, such error is harmless where there is no reasonable probability the jury would have reached a more favorable verdict had the trial court excluded the challenged evidence. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) As respondent notes, this standard applies to the erroneous admission of character evidence such as other-crimes evidence (*People v. Malone* (1988) 47 Cal.3d 1, 22), as well as gang evidence (*People v. Avitia* (2005) 127 Cal.App.4th 185, 194).

First, in denying the motion for mistrial the trial court observed that Carrillo was a reluctant witness at trial. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869; Evid. Code, § 780.) A defendant's gang membership and prior criminality may be admissible to explain the witness's fear, even if the fear is not directly linked to conduct or threat by defendant. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1450.) Carrillo's opinion of defendant, his reputation, and his gang membership were probative of his fear and explained his memory failures, reluctance to identify defendant, and inconsistent statements at trial. Under such circumstances, the trial court would not have been in error if it refused to exclude the interview in its entirety.

16

In addition, the evidence of intent to kill was overwhelming. Defendant admitted that he stabbed Schmid and did not claim that it was an accident. Defendant plunged nearly the entire length of the three-inch blade into Schmid's chest, pierced his heart, and then, although Schmid was unarmed and intoxicated, defendant held him down so Schmid could not struggle. Similar circumstances led the California Supreme Court to comment that the "defendant could have had no other intent than to kill." (*People v. Bolden* (2002) 29 Cal.4th 515, 561.) In addition, evidence that defendant carried his folding knife open in his pocket while he was with Schmid and then stabbed Schmid in a vital organ suggest premeditation. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

In contrast, the evidence supporting defendant's heat-of-passion defense was weak. Verbal taunts may be sufficient where the provocation was "'such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 585-586.) In general, mere words cannot meet the objective test for sufficient provocation and thus reduce murder to manslaughter. (*People v. Valentine* (1946) 28 Cal.2d 121, 140.) This is particularly so where the use of foul or obscene language was normal between the defendant and the victim. (*People v. Cole* (2004) 33 Cal.4th 1158, 1216.) Here, as demonstrated by defendant's police interview, defendant often peppered his own speech with foul epithets, and he understood that Schmid had a tendency to make crude sexual remarks when he was intoxicated. Indeed, defendant was accustomed to hearing Schmid talk about "bagging whores, getting his dick sucked, things like that." Finally, defendant did not believe that Pina had really had sex with Schmid. It is unlikely that the foul language and the sexual remarks would have caused an ordinary sober person to lose reason and judgment under those circumstances, and it is not reasonably probable that the jury would have found sufficient provocation in this case.

Further, the trial court admonished the jury very broadly not to consider gang evidence for any purpose. We presume that jurors are able to understand and follow instructions limiting the purposes for which evidence may be considered. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) We conclude that there is no reasonable probability

17

the jury would have reached a more favorable verdict had the trial court not admitted evidence that defendant was a gang member who may have robbed people.

## III.  Penalty assessment

Defendant asks that we strike the $100 penalty assessment that appears in the trial court's minutes of October 25, 2012.  The trial court did not impose the assessment in its oral pronouncement of sentence and it does not appear in the abstract of judgment.  Respondent agrees that the penalty assessment was unauthorized and should be stricken.

The minutes state that the assessment was imposed pursuant to section 1464 and Government Code section 76000, which provide for a surcharge on fines, but not on restitution or parole revocation fines.  (§ 1464, subd. (a)(3)(A); Gov. Code, § 76000, subd. (a)(3)(A); see *People v. Boudames* (2006) 146 Cal.App.4th 45, 50-51.)  Nor may the assessment be imposed on other fines imposed by the trial court.  (See § 1465.8, subd. (b); Gov. Code, § 70373, subd. (b).)  Further, the clerk was not authorized to insert a fine that was not ordered by the court.  (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 387-388, 390.)  We therefore order the penalty stricken from the minutes.  (*Ibid.*)

## DISPOSITION

The trial court is ordered to correct its minutes of October 25, 2012, by striking "$100 assessment and surcharge (1464 P.C. & 76000 G.C.)."  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

18